TALIAFERRO, Judge.
Plaintiff was injured on July 13, 1949, while working as welder for the defendant. He sued his employer for compensation at .the rate of $30.00 per week for four hundred weeks, and for physician’s and medical expenses incurred to relieve his pain, etc., and to be incurred, to the amount of $500. Specifically, he alleged that the following described injuries to him were the result of the accident, and have produced total permanent disability, viz: Contusion of the upper part of the chest and of the head; compression fracture of the fifth lumbar vertebra with anterior displacement; incomplete fracture of the left ilium near the sacro-iliac joint.
He further alleged “that he has suffered constant and continuous pain since the date of the accident * * * and would not have been able to work during the time which he did for Tennessee Gas Transmission Company except the type work provided allowed him to sit down and rest for the greater portion of the working day.”
The defendant denied each and every essential allegation of the petition save those relating to its corporate capacity and to the identity of its Louisiana agents for service of legal process.
Defendant appealed from judgment in plaintiff’s favor.
The defendant was engaged in the laying of a thirty inch (30”) pipe (gas) line in Ouachita Parish, and plaintiff’s duty required him to tie the - ends of the sections of pipe by welding. To accommodate the pipe as it was being laid, a trench some eight feet deep was dug. ' While plaintiff was bending over in the act of Welding the ends of- sections of the pipe, one side of the ditch bank caved or sloughed off and buried him against the pipe. Fellow workmen quickly. came to his rescue, and he says that in five or ten minutes, by means of shovels, he was extricated from the uncomfortable predicament. He was immediately driven to a clinic in the City of Monroe, and was there closely examined, X-rayed and given treatment by Dr. Bendel. Very soon thereafter the defendant’s employed physician, Dr. Watts, transferred him to another sanitarium in said city, where he stayed for one day and night. Dr. Watts treated him for one week and advised him to return to light duty. He reported back for duty and worked one day and then was absent from *629 duty for twenty-eight days consecutively. During this period he did not complain to any officer or agent of defendant, nor to Dr. Watts, of suffering pain of any sort, nor of being disabled to do his work.
On August 5th plaintiff consulted an attorney in the City of Monroe, who sent him to Dr. J. W. Cummings, general practitioner there, for examination, etc. Dr. Cummings made the examination and also made X-ray pictures of his body. On August 9th plaintiff again reported for duty arid continued to do the work of welder until November 10th. His employment terminated then because the job on which he was working had been completed. He was the last welder to be discharged. He admits that from August 9th to November 10th he did not inform any of defendant’s officers or agents to whom injury or disability should be reported, that he was paining from the accident, nor that he was performing his work under difficulties; nor did he go to a physician for relief during that period. He returned to Monroe and again on November 18th, he consulted Dr. Cummings. Additional X-rays were then made. Soon thereafter demand upon defendant for payment of compensation was made by his attorney and on its refusal to do so, this suit was filed. He returned to his home in Os-kaloosa, Iowa, and stayed there until a few •days prior to trial of the case on March 8, 1950. While in Iowa he did not seek the' services of a physician to alleviate his pain and suffering.
When Dr. Cummings first examined plaintiff he was then complaining of pain in the left side of his head, left upper chest and in the lower part of the back, which plaintiff said, radiated down both legs. Dr. Cummings says the back then showed “spasm of the lumbar-sacral muscles, with pain and tenderness over the sacrum, with an increase in the normal anterior lumbar curve.” In all other respects the physical examination was negative. The X-ray pictures, according to Dr. Cummings, revealed no pathology save that the fifth lumbar vertebra “shows anterior displacement in relation to the first sacral, with narrowing of the posterior part of the body of the fifth lumbar vertebra", and an “incomplete fracture line running laterally and downward” of the left ilium.
At time of the second examination by Dr. Cummings, the patient was complaining of the same symptoms as previously. Physical examination was again negative, excepting the “lower lumbar area which showed an increase in the anterior curvature in the lower lumbar region with muscle spasm and tenderness over this area.” Disclosures of thé X-ray pictures at that time were the same as the former ones. Dr. Cummings considered the incomplete fracture of the ilium of “minor consideration”. It had healed. He diagnosed the injury to the fifth lumbar as being compression fracture with anterior or fórward' displacement. This pathology of the vertebra, Dr. Cummings says, causes loss of normal weight bearing, with consequent pain, particularly upon bending and straining. He did not believe plaintiff would ever be able to again do the work of welder and did not advise hospitalization. He was not asked to prescribe treatment for the injuries, but was simply requested by plaintiff’s counsel to make examination and pictures in order to determine the cause of the pain of which plaintiff complained.
In answer to a question by defendant’s counsel, Dr. Cummings outlined appropri-áte treatment in- a case of this character. He said:
“A. Well, you place them on a frame with extension of the back, probably with or without traction of the legs, depending upon the force under treatment and then the use of either a cast or a supporting brace after a period of approximately two to three weeks.
“Q. Would that normally require hospitalization ? A. It would.”
. It is certain plaintiff has not undergone such treatment, nor has he intimated a willingness to do so.
Dr. A. Scott Hamilton, whose practice is limited to orthopedic surgery, called as a witness for the plaintiff, did not physically examine him. He was shown and interpreted the X-ray pictures made by Dr. Cummings. He interpreted some of the films as disclosing a “spondylolisthesis or a forward *630 gliding of the fifth lumbar vertebra one cem timeter or .4 of an inch, practically, together with some compression of the posterior portion of the body of that vertebra * * * also a defect of the lamina is 'seen, which is the underlying pathological change necessary in the usual case for a spondylolisthesis to 'occur.” He also found a fracture line in one of the iliums. He was of the opinion that the deformity of the vertebra and fracture of. the ilium could have been caused by the heavy quantity of dirt falling upon plaintiff. His idea of appropriate treatment for injuries of the sort mentioned, differed widely from that stated by Dr. Cummings. However, plaintiff has not seen fit to submit to either formula. Dr. Hamilton was unable to say whether the spondylolisthesis was congenital or due to trauma. He found evidence of a mild compression deformity of the back portion of the body of the fifth vertebra, which he says “may have been the result of compression injury”, but he declined to give the opinion that it was really a fracture. He thought that any disability plaintiff may have is due to the spondylolisthesis.
Interpreting his own pictures, Dr. Ben-del found no evidence whatever of pathology of any of the bones, and was certain that such pictures did not disclose compression fracture of the fifth vertebra, nor fracture of the ilium.
Dr. Bendel was the first doctor to see and examine plaintiff after the accident. He said: “I thought he had received an injury that was of temporary disability; that is, was of no serious moment and that he should be all right within four or five weeks.”
Dr. Bendel was presented with the X-ray pictures made by Dr. Cummings, and after having closely inspected them, declared that the pictures, like his own, were negative as to fractures.
Dr. Daniel M. Kingsley, orthopedic surgeon, of considerable experience, examined plaintiff on November 17, 1949, and also had a series of X-ray pictures made. His testimony- reveals that the physical examination indeed was thorough. He put plaintiff through what appears to be all of the known tests in the effort to determine his true physical condition. He was certain; from the examination and plaintiff’s reaction thereto, that he then was not disabled to do hard work. The films, he said, did not disclose any fracture of the vertebra or ilium. He did find that one or more of them disclosed a congenital anomaly in the fifth lumbar vertebra. It is, he said, of narrower width than the sacrum proper, “so that one would tend to speak of a spondylolisthesis, that is, a slip of the vertebral column forward, approximately 8 millimeters on the fused portion of the sacrum.” He advanced plausible physiological reasons to support his opinion.
The X-ray pictures made by Dr. Cummings were interpreted by Dr. Kingsley. Their disclosures, he says, are not unlike those of his own. He found no compressed fracture of the fifth lumbar vertebra. In effect, his testimony indicates that Dr. Cummings and Dr. Hamilton misinterpreted the pictures of the former. He added that this type of spine “is found as a growth development.” Traumatic spon-dylolisthesis, he said, may only be produced by violence of a “degree so extreme that the patient is incapacitated for movement, due to the associated tearing of ligaments and muscles”, and severe pain that necessarily follows; and that it is impossible for a fracture of this kind to occur without hemorrhage “and the hemorrhage is healed by transformation into bone, and there is no evidence (in this instance) of such a process.”
Dr. David Salmon, head of the X-ray department at the St. Francis-Cabrini Hospital in Alexandria, Louisiana, did not have opportunity to physically examine plaintiff, but he did interpret the X-rays made by Drs. Cummings, Bendel, Lobrana, Kingsley and Caldwell. His interpretation of the Cummings films was the same as made by Dr. Kingsley. He found congenital abnormality in the fifth lumbar vertebra, and was sure these pictures did not reflect evidence of trauma fracture or compression of this vertebra. He assigned the following reasons to support the opinion that the malalignment of this vertebra *631 was not due to trauma, viz.: “There are no reactions in the immediately adjacent bones or in the posterior bony rings of the last lumbar vertebra, which would be suggestive of the fact that it had been submitted to considerable trauma. There are no bony changes suggestive of same.”
His interpretation of the other pictures was identical with the doctors who made them. He concluded by saying that he consumed some three or four hours in studying the pictures before giving his testimony.
X-ray pictures of the plaintiff were made by Dr. Charles M. Lo'brano, chief Roentgenologist of the X-ray department of the St. Francis Sanitarium in Monroe,■ Louisiana, the day of the accident. These pictures revealed the congenital condition in the fifth lumbar vertebra about which other physicians testified. He found no pathology whatever to support the interpretation of traumatism of this bone. His interpretation of Dr. Cummings’ films was the same as that made by other doctors who testified on behalf of the defendant. He found no evidence of fracture of the ilium in any of the films.
.The testimony of Dr. Gene Caldwell, outstanding orthopedic surgeon of Shreveport, Louisiana, was taken on March 25, 1950. He physically examined plaintiff and made X-ray pictures of him three weeks previous. Anent the physical examination, he said: “Motion throughout the lumbosacral spine is full and free in all planes and directions ;and this motion did not produce any subjective pain.”
No involuntary spasm of muscles about the fifth lumbar vertebra was detected.
The physical examination of Dr. Caldwell was extremely thorough, and negative for any bone pathology. He found no clinical reason why plaintiff should not engage in any sort of labor he had previously performed. The X-ray pictures made by him were also negative as to compression or fracture of the named vertebra and the ilium. He did find that the films revealed the same congenital abnormality of that vertebra, as was found by other doctors who testified on defendant’s behalf. He also examined and interpreted the films made by Dr. Cummings and did not observe therein any evidence of trauma to the vertebra or ilium, but did find the congenital anomaly about which other physicians testified. He testified:
“Q. Doctor, will you please tell me from your reading of the X-rays which are marked ‘P-1’ through ■‘P-7’ inclusive, whether from those plates you were able to determine whether or not Mr. Gorley sustained a compression fracture of the fifth lumbar vertebra with anterior displacement? Á. I should say that he did not. If he had sustained a compression fracture of the fifth lumbar vertebra it is the most perfectly reduced and perfectly healed fracture of a vertebra I have ever seen.”
The whereabouts of Dr.-Watts at time of and prior to trial was unknown to defendant; hence, his testimony was not taken.-
A consideration of the testimony of the doctors who testified in the case, irresist-ably leads' to the conclusion that Dr. Cummings and Dr. Hamilton were mistaken in their interpretation of the X-rays made by the former; that there was no fracture of the ilium, nor compression fracture of the vertebra, but, on the contrary, the pathology found by them was a congenital anomaly. These conclusions are strongly supported by plaintiff’s own action after the accident, as we shall endeavor to demonstrate hereinafter.
It is reasonable to believe, as we do, that had the vertebra been suddenly and violently displaced forward nearly .4 of an inch, the rupture and tearing of muscles and ligaments, etc., as said by Dr. Kings-ley, would have produced such pain and disability that plaintiff would not have been able so quickly to go about as he did or do any work at all.
Plaintiff alleged and testified that he has been in constant, unrelenting pain (save while asleep in the night time) since the accident; so much so, that he could only perform his duties as welder with extra assistance. This sounds strange, when it is recalled that prior to and after August *632 Sth he never sought medical service from his employer, nor privately, except the one visit to Dr. Cummings after his employment terminated. He would have us believe that during the twenty-eight days of his seclusion, he withstood this agonizing pain and suffering, but did not seek relief, free for the asking, from his employer. It does not make sense.
All welders are provided with a helper or assistant.
On August 17th plaintiff, while at work, was interviewed by Mr. C. O. Tartar, adjuster for all Louisiana Adjusters, and at that time plaintiff’s version of the accident and what he said of its results, were reduced to long-hand writing, being two and one-half pages, and each page was signed by him. He admits that he watched Mr. Tartar as he did the writing, and read the whole statement after it was completed. After the dirt was removed, he said therein, “I walked down the pipe to road which was about 30 feet away.” He then got in the car that carried him to the clinic in Monroe. He also said in the statement: “I was to return July 21, 1949, to do light duty. I reported for work and worked July 21, 1949, but was unable to return the next day. I was off until August 9, 1949, when I returned to work and resumed my regular duty. I have performed same duties as in the past without handicap, pain or discomfort. I received my same salary of $2.25 per hour, 16 hours per day, 7 days a week.”
After the statement w.as first read to plaintiff, he suggested that a correction or addition thereto be made, which he admits was done. He also said in the statement: “I have read the above and foregoing two and one-half pages and know it is true and correct.”
He admits he signed the statement freely and voluntarily.
Mr. Tartar testified that when he reached the place where plaintiff was working, he asked for him and someone there holloed to him to come out of the hole, “and at that time I saw him in the ditch, and he got upon the pipe and just gave a jump to the bank like any ordinary person would, coming out of a hole”; that he evidenced no sign of pain or disability.
After resuming work on August 9th, plaintiff worked twelve days in Louisiana and was transferred to the State of Mississippi, where the same sort of work was done by him until discharged. During this period, exactly three months, he was paid for his services nearly $3,000.00, and would doubtless be still working for the defendant had not the job been finished. It is unthinkable that such enormous wages would be. paid any welder who was not physically able to perform the maximum service expected of him.
To support his contention that after August 9th he was of his own strength unable to fully perform the heavy duties of welder, and only did welding with the assistance of others, was to some extent supported by the testimony of some three of his fellow workmen. Without giving an epitome of their testimony, we pause to say that it does not impress us to any great extent, especially so in view of the strong evidence and circumstances wholly contrary thereto.
Plaintiff’s helper was his own son. He was present in Court when the case was tried, but was not called upon by plaintiff to testify. Unfavorable implications arise from this most unusual action. Surely, a son stands ready to bolster his father’s cause when he believes he is right.
We are convinced that plaintiff’s case was not made out. For the reasons herein assigned, the judgment from which appealed, is avoided, annulled and reversed, and this suit is dismissed at his cost.
KENNON, J., dissents, giving written reasons.